Coopwood *v.* Bolton et al.

THOMAS COOPWOOD *v.* RICHARD BOLTON et al.

C. and D., as agents of the Pontotoc and Holly Springs Land Company, entered into an agreement, on the 19th of February, 1842, with B. and H., agents of the New York and Mississippi Land Company, and which agreement refers to one entered into by the Pontotoc and Holly Springs Land Company (of which C. and D. were members), on the 19th of November, 1836, with the said New York and Mississippi Land Company, in which the first-mentioned company purchased of the last named, seventy-seven and a quarter sections of land for $173,040; one third of which was at the time paid in cash, and, to secure the other two thirds, the purchasers, C. and D., executed their notes, bearing interest. The agreement of the 19th of February, 1842, so modified the one of the 19th of November, 1836, as that B. and H. should take back thirty-five sections of the land, which was unsold by C. and D., upon their securing the payment of $16,230.64 by a deed in trust, to be paid in four equal payments, for which C. and D. executed their four joint notes; it further provides, that the notes for the thirty-five sections of land shall be surrendered to C. and D., and they to deliver up the bonds for title they had received for the land. *Held*, that the meaning of this change is, that C. and D. agreed to pay $16,230.64, and surrender the thirty-five sections of land, to be released from any further payment for those sections of land.

Where an account is once received by a party without objection, it becomes an account stated, and it can only be contradicted by clear and satisfactory testimony. *Stebbins* v. *Niles*, 3 Cushm. 267, cited and confirmed.

ON appeal from the northern district chancery court at Holly Springs; Hon. Henry Dickinson, vice-chancellor.

Thomas Coopwood filed in the vice-chancery court a foreign attachment bill, alleging, amongst other things, that on the 19th of November, 1836, he, with James Davis, Jesse B. Clements, Benjamin Clements, William H. Duke, Alexander C. McEwen, William McEwen, William Y. Goodall, David Henderson, and John W. Lane, who were

partners, as land speculators, under the style of "the Pontotoc and Holly Springs Land Company," purchased from John Delefield, Joseph D. Beers, Knowles Taylor, Morris Ketchum, Benjamin Curtis, Charles Atwater, and John Bolton, trustees of "the New York and Mississippi Land Company," through David Hubbard and Richard Bolton, the agents of the last-named company, 77¼ sections of land, in the Chickasaw cession, at the price of $2,240 per section, amounting to $170,040, of which sum, one third part, being $57,680, was paid in cash at the time of the purchase; and for the remaining two thirds the members of the Pontotoc and Holly Springs Land Company executed to Hubbard & Bolton, as agents, two joint notes, under seal, for the sum of $746.66⅔ each, for each of the sections, payable in two and three years, with interest at the rate of six per cent. That there were 17 quarter sections among the lands purchased, for which two notes were executed, for $3,173.33⅓, each payable and bearing interest like those given for the whole sections; and the New York and Mississippi Land Company, on the other hand, executed separate title bonds for each of the whole sections, and one for the 17 quarter sections, conditioned to make titles when all the purchase-money due upon each section should be paid. That the Pontotoc and Holly Springs Land Company converted the lands thus purchased by them into a joint stock of eight shares, of $21,630 each, whereof Jesse B. and Benjamin Clements owned, jointly, one share; David Henderson and William Y. Goodall, jointly, one share; and the other six members of the company one share each, in which proportions they furnished the cash payment of one third that was made upon the original purchase. That the Pontotoc and Holly Springs Land Company proceeded to sell their lands until July, 1839, when the complainant and William H. Duke were appointed, by a power of attorney, as the agents of the company, and clothed with authority to sell the lands, pay the debts, and close up the whole business. That the complainant and Duke proceeded to sell lands and pay debts, until the 19th of February, 1842, when, being unable to meet their debt to the New York and Mississippi Land Company with promptitude, they made an

agreement in writing, for themselves and as agents of their company, with the New York and Mississippi Land Company, whereby the latter company agreed to modify the original contract of purchase, so as to take back 35 sections of land which then remained on hand unsold, upon the complainant and Duke securing to be paid to it the sum of $16,230.64, and they accordingly executed their four writings obligatory for $4,057.66 each, due April 1, 1843, 1844, 1845, and 1846, and bearing interests from date, the payment of which was secured by a deed of trust; and it was stipulated in the agreement that the notes given for the lands taken back, should be surrendered as soon as it could be ascertained that the lands embraced in the deed of trust were disincumbered, which was done shortly thereafter, and the notes and title bonds for the 35 sections were mutually cancelled and surrendered.

It is then alleged that by the cancellation of the original contract as to the 35 sections taken back, the complainant's company was left indebted to the other company, on the 19th of November, 1836, the date of the original purchase, on account of the purchase-money due for the remaining $42\frac{1}{4}$ sections, in the sum of $36,960. That on the 30th of November, 1842, the New York and Mississippi Land Company rendered to the complainant and Duke an account, showing that, up to that time, and subsequent to the 19th of November, 1836, they had received, or collected upon collaterals on account of the Pontotoc and Holly Springs Land Company, $43,307.87, which they had applied to the payment of notes of the late company. That on the 8th of August, 1844, another account was rendered, showing that, up to that date and subsequent to November 30th, 1842, the amount collected and applied was $33,428.35. That on the 1st of June, 1846, another account was rendered, showing that up to that date and subsequent to the 8th of August, 1844, the amount collected and applied was $10,931.56. That on the 8th of June, 1847, another account was rendered, showing that up to that date and subsequent to the 1st of June, 1846, the amount collected and applied was $23,387.06; and, as a further payment upon the debt of their company, the complainant and Duke, on the 8th of June, 1847, sold to the New

Coopwood *v.* Bolton et al.

York and Mississippi Land Company, lands to the value of $7,122; all these payments amounting to the aggregate sum of $118,176.83.

That the New York and Mississippi Land Company, contrary to the express instructions of the complainant and Duke, instead of applying the money collected by them for the Pontotoc and Holly Springs Land Company, so as to pay off whole notes, spread out every payment in credits upon all the notes of the members of the latter company, making the amounts' of the credits less than the interest, and then computing interest on the principal up to the date of the credit, adding the interest to the principal, and deducting the credit from the amount, thereby making up and reserving a large sum by way of usurious interest.

That Richard Bolton, as the agent of the New York and Mississippi Land Company, had the almost exclusive management of the business of that company in Mississippi; made all the collections, and applied the payments, and complainant and Duke supposed he would apply the payments correctly and as instructed to do; and complainant only discovered, a few days before he filed his bill, while examining the accounts for another purpose, how illegally said Bolton had applied the collections made by him as aforesaid, by means of which the New York and Mississippi Land Company have retained large sums of money which are now justly due from them to the Pontotoc and Holly Springs Land Company, but the amount complainant cannot state, because he cannot understand the accounts.

That up to the 8th of August, 1844, the New York and Mississippi Land Company had collected from collaterals, the sum of $25,692.11, over and above a sum sufficient to pay off the indebtedness of the Pontotoc and Holly Springs Land Company, for the purchase of the 42¼ sections of land not taken back, including interest from the 19th of November, 1836; notwithstanding which overpayment, the New York and Mississippi Land Company were still largely indebted to them, retained some $37,000 of collaterals to meet the same; and up to the 1st of June, 1846, they had collected upon those collaterals the sum of $10,931.56, and from that time up to the 8th of

June, 1847, they had collected thereon the further sum of $23,-389.06, and on that day a further payment of $7,122 was made in lands, leaving the New York and Mississippi Land Company indebted to the Pontotoc and Holly Springs Land Company, in the sum of $67,132.73.

That there are many other errors in the statements rendered by Bolton, but, from the manner in which the accounts were kept, complainant and Duke did not discover the errors when the accounts were rendered, or that the indebtedness of their company had been overpaid, and only discovered the same a few days since.

That complainant and Duke permitted the New York and Mississippi Land Company to retain said sum of $67,132.73, under a mistaken apprehension, produced by Bolton, that the same was justly due to said company, when such was not the fact. That the amounts were large, and the accounts complicated and difficult of comprehension, and the complainant and Duke relied exclusively upon the statements furnished by Bolton as to the amount due, and were misled and deceived thereby; and the complainant had no means of ascertaining the amount due from his company, because the statements furnished by Bolton were so perfectly unintelligible that he is yet unable to comprehend them.

That the New York and Mississippi Land Company is now indebted to the Pontotoc and Holly Springs Land Company, in the sum of $67,131.73, with interest on $25,692.11, from August 8, 1844; on $10,931.56, from June 1, 1846, and on $30,509.06, from June 8, 1847, and refuses to pay the same, and claims that there is still a large balance due to it on account of said purchase of lands.

That Bolton has acted, from the commencement of the transaction, as the agent of the New York and Mississippi Land Company, by whom all his acts in the premises have been approved and ratified; and he now has in his hands a large amount of money and bills receivable which belong to said company, and are subject to the payment of the debt due from them to the Pontotoc and Holly Springs Land Company, as also has George G. Reneau.

It is next alleged that the other living members of the Pontotoc and Holly Springs Land Company, and the heirs and legal representatives of those who have died, refuse to join the complainant in his bill, and they are, therefore, made parties to it as defendants, as also are the trustees of the New York and Mississippi Land Company; and Bolton and Reneau are likewise made defendants, as home defendants, having in their hands effects belonging to the New York and Mississippi Land Company.

He prays that the defendants may be required to answer the bill; that an account may be ordered between the two companies, and that the New York and Mississippi Land Company may be decreed to pay the Pontotoc and Holly Springs Land Company the amount that may be found due to the latter company upon the taking of the account, for an order for the safe keeping of the effects attached in the hands of Bolton and Reneau to abide the final decree of the court, and for general relief.

Bolton's answer, which is adopted throughout as their own by the trustees of the New York and Mississippi Land Company, admits that Hubbard and himself, as agents for that company, sold the Pontotoc and Holly Springs Land Company 77¼ sections of land on the 19th of November, 1836, at $2,240 per section; states that some of the lands were worth $6,000 or more per section, whilst others were not worth more than $500, and the sale in question included all the lands owned by the New York and Mississippi Land Company which lay west of the Basis Meridan, and they were sold, good and bad together, at the same price; that the contract was entire, and the cash payment of one third was applied upon the whole contract, and not upon particular sections. Separate notes and title bonds were executed for each of 73 whole sections, and two notes and a single title bond for 17 quarter sections, there being 146 notes of $746.66⅔ each, numbered from 74 to 219, and two notes of $3,173.33⅓ each, numbered 220 and 221; and in the accounts between the parties these notes were afterwards referred to and designated by their numbers. This arrangement was made for a double purpose; to enable the purchasers

Coopwood *v.* Bolton et al.

to make titles to their vendees when the purchase-money was paid for particular sections, and secure the payment of purchase-money to the New York and Mississippi Land Company.

Admits that Coopwood and Duke, in July, 1839, were appointed as agents of the Pontotoc and Holly Springs Land Company, and that they ever afterwards acted as such agents. Denies, generally, the allegations of the complainant touching the agreement of the 19th of February, 1842, and the propriety of the construction placed thereon by him. Alleges that, by November, 1839, the Pontotoc and Holly Springs Land Company had disposed of the most valuable portion of the $77\frac{1}{4}$ sections, and those then remaining unsold were refuse lands, which could not readily be sold; that the cash received for lands sold by them had not been uniformly applied to the payment of their debt for the purchase-money, and the notes taken from their vendees were not generally matured; that eight of the ten members of the Pontotoc and Holly Springs Land Company were either insolvent, or had removed or concealed their effects; the complainant was embarrassed in his circumstances, and Duke's property was insufficient for the payment of the debts due from his company. A sale of the unsold lands, at once, and at any sacrifice, was therefore resolved on by Coopwood and Duke. They struck handbills and circulated them extensively, advertising a sale of the lands at auction in Holly Springs on the first Monday of February, 1840, and declaring that the sale would be absolute, whether the lands sold low or high. The sale took place, and continued two days, but only a small quantity of land was sold, and at very low rates. The total proceeds of the sale were \$5,144.80, or an average of \$685,97$\frac{1}{2}$ per section, and that nearly all the purchasers were members of the Pontotoc and Holly Springs Land Company. The signal failure of this attempt to sell the unsold lands led to another scheme of disposing of them, and on the 14th of March, 1840, Coopwood and Duke submitted a written proposition, to return to the New York and Mississippi Land Company $30\frac{1}{4}$ sections of land, then unsold, at \$2.25 per acre, or \$1,440 per section. This, according to the detailed statement

in the answer, would have involved an apparent loss to the Pontotoc and Holly Springs Land Company of $37,677.74, or $1,246.54 per section; but this loss was merely apparent, as the best lands had all been sold at a heavy profit.   This proposition remained open, and was never acted on until February 19th, 1842, because the agency of Hubbard and Bolton being joint, neither could act without the other; and Hubbard, living in Alabama, and spending much of his time in travelling, could not be brought to Pontotoc to meet the other parties until that time, when the agreement of that date was entered into, upon the basis of the proposition of the 14th of March, 1840.   Thirty-five sections were taken back by that agreement, instead of 30¼, as originally proposed, at the price of $1,500 per section, instead of $1,440, and Coopwood and Duke secured to the New York and Mississippi Land Company, by a deed of trust upon their individual property, the payment of the sum of $16,230.64, being the balance of the purchase-money due upon the 35 sections taken back, after deducting their price at $1,500, which they had not proposed to do in their proposition of March 14th, 1840.   The words "take back" were used in the agreement instead of the word "resell," in order to avoid a recognition, on the part of the New York and Mississippi Land Company, of the title of the Pontotoc and Holly Springs Land Company, in case it should turn out that any of the lands taken back had previously been sold by Coopwood, and because Duke, as it was thought, might otherwise be bound to make titles or pay damages to vendees of Coopwood, and he was unwilling to incur any further obligations beyond such as were necessary to close the business.   That Copwood, in now insisting that the cash payment of $26,133.33, originally made upon the 35 sections taken back, should be applied as a credit upon the notes given for the 42¼ sections retained, is guilty of a gross breach of faith, well knowing, as he does, that such application is contrary to the intention of all the parties to the agreement of the 19th of February, 1842; and that, by the agreement to take back the 35 sections at $1,500 per section, the New York and Mississippi Land Company lost at least $10,000, as was anticipated at the time it was made.

That if the agreement of the 19th of February, 1842, will bear the legal construction contended for by Coopwood, it is because the draughtsman, by mistake, failed to set forth and express, truly and perfectly, the real intention of the parties thereto.

Admits that Coopwood and Duke, in order to carry out their part of the agreement of February 19th, 1842, executed to Hubbard and Bolton, as agents, their four writings obligatory, for $4,057.66 each, making $16,230.64, payable April 1st, 1843, 1844, 1845, and 1846, bearing interest from date, and secured the payment of the same by a deed of trust. These were numbered from 758 to 761, and were afterwards, in the accounts, referred to by those numbers. States that respondent investigated the titles to the lands embraced in the deed of trust, and found them perfect; and, having rescinded some sales which Coopwood had made of a part of the 35 sections taken back, the agreement of the 19th of February, 1842, was fully executed in all its provisions on the 8th of December, 1842, when the notes and title bonds relating to the 35 sections were mutually cancelled and surrendered.

Denies that, by the agreement of the 19th of February, 1842, the Pontotoc and Holly Springs Land Company were left indebted to the New York and Mississippi Land Company in the sum of $36,960 only, as stated by the complainant, on the 17th of November, 1836, on account of the purchase-money due on the 42¼ sections retained, and alleges that the amount of that indebtedness was $93,093.33.

Admits that on the 8th of December, 1842, as the agents of the New York and Mississippi Land Company, the respondent rendered to Coopwood and Duke an account, made up to November 30th, 1842, showing what moneys he had received and collected up to that time on account of the Pontotoc and Holly Springs Land Company; how the same was applied to the notes of the latter company, and the balance due under the contract on the 30th of November, 1842. A copy of the account, showing that the whole amount received and collected was $43,307.87, of which only $39,894.74 were applied to the notes of the Pontotoc and Holly Springs Land Company, the residue of

$3,412.93 being reserved by direction of Coopwood and Duke for future application; and that the amount then due from the Pontotoc and Holly Springs Land Company, exclusive of the $16,230.64 due from Coopwood and Duke individually, was $41,382.62; which account and statement was received by the complainant without objection at the time, although he knew that the credit of $26,133.33, now claimed by him, had not been allowed, and has been retained by him for seven years without complaint. Admits that on the 8th of August, 1844, respondent rendered to Coopwood and Duke another account, showing that the amount collected and applied by him, from the 30th of November, 1842, including the sum of $3,412.93 reserved in the former account, was $15,889.52 only, instead of $33,468.34, as stated by the complainant; and at that time, $15,494.91 only were applied upon the notes of the Pontotoc and Holly Springs Land Company, the residue of $394.61 being applied to the payment of costs and expenses, except $78.03 which were reserved for future application.

Admits that on 1st of June, 1846, respondent rendered to Coopwood and Duke another account, showing that the amount collected and applied by him, from the 8th of August, 1844, including the sum of $78.03, reserved in the last account, and deducting expenses, &c., was $10,931.66.

Admits that on the 8th of June, 1847, respondent rendered to Coopwood and Duke another account, showing that the amount collected and applied by him, from the 1st of June, 1846, was $23,389.06; and that the proceeds of lands, that day resold by Coopwood and Duke to the New York and Mississippi Land Company, was $7,120; making a total of $30,508.26, after deducting eighty cents for taxes, which was applied to the notes of the Pontotoc and Holly Springs Land Company.

States further, that, besides the collections already admitted, Duke has paid the respondent $4,020.07; which payment is not mentioned by the complainant in his bill.

The statements of the complainant and the respondent, in relation to the amount of collections made by Bolton, differ to

19*

the extent of $21,347.06; and the grounds of that difference are explained by a detailed statement in the answer.

Bolton proceeds to give a minute and circumstantial account of the mode in which he applied collections to the credit of the notes of the Pontotoc and Holly Springs Land Company, and of the reasons which induced such application; showing that said company was interested in having the applications made as they were made, and that Coopwood and Duke authorized and assented to the same at the time when they were made. He denies that he applied the payments in the manner alleged by Coopwood, or for the reason stated by him. He also denies that he computed interest in such a manner as to compound it, and alleges that he computed it in the mode prescribed by statute in Mississippi, in regard to partial payments. He admits that some errors occurred in the computation of interest, all of which that were discovered by him were promptly corrected; and a statement of all the errors which he has found to exist, after a careful examination of every computation of interest in all the accounts, show that the errors against the Pontotoc and Holly Springs Land Company amount to $19.49, and those in their favor to $48.60.

Bolton files a statement, showing all the applications that were made of credits upon the notes of the Pontotoc and Holly Springs Land Company, from first to last, and the date of each application, from which it appears that many notes were paid by applications of a single date. He admits that he 'has had the almost exclusive management of the affairs of the New York and Mississippi Land Company in Mississippi, except as to the taking back of the 35 sections, in which Hubbard acted with him; that he has received and applied all the payments made by or for the Pontotoc and Holly Springs Land Company, and kept and rendered the accounts; and alleges that Coopwood knew and approved of every application of payments that was made, from the beginning, as appears from the statements signed by him and Duke.

States that Coopwood asked for the memorandum, and respondent let him have it; and now, instead of exhibiting the

accounts that were really rendered to him, Coopwood produces this rough memorandum, which was not rendered as an account, as a specimen of the account which he withheld, and which are plain and intelligible. Alleges that Coopwood was always well advised of the condition of the affairs of his company, and understood the accounts that were rendered to him.

Denies that the New York and Mississippi Land Company is indebted to the Pontotoc and Holly Springs Land Company in the sum of $67,123.73, as alleged, or in any sum whatever; or that there are any errors in the accounts as rendered, except those mentioned.

Avers that the Pontotoc and Holly Springs Land Company, or Coopwood and Duke, are still indebted to the New York and Mississippi Land Company.

Admits that he has in his hands a large amount of effects belonging to the New York and Mississippi Land Company.

The answer of the trustees of the New York and Mississippi Land Company sets forth that theirs is a private joint-stock company, with a capital of $512,125, the shares of which are transferable at the will of the holders, and whose affairs are managed by the trustees. They admit that Hubbard and Bolton were appointed as agents of the company soon after its organization, and vested with full authority to transact its business in Mississippi; and that their acts, so far as known to the trustees, have been by them confirmed; and especially that they ratify the act of their agents in repurchasing from the Pontotoc and Holly Springs Land Company 35 sections of land at $1,500 per section, on the 19th of February, 1842, which they were shortly afterwards informed by said Bolton was what was that day done by himself and said Hubbard.

They state that they have no knowledge or information in regard to the sale of the 77¼ sections of land to the Pontotoc and Holly Springs Land Company, or to any of the subsequent proceedings and accounts between the two companies, except what they have derived from their agents; wherefore, they refer to and adopt the answer of Bolton, throughout, as their own.

As to the application of the payments to the notes of the

Pontotoc and Holly Springs Land Company, the defendants plead, in bar to the relief prayed for, that all the credits were applied with the knowledge, consent, and approbation of Coopwood and Duke, to whom accounts of the same were rendered at the time, and which accounts have since been held and acquiesced in for many years without objection or complaint, so that the same have become stated and settled accounts, and ought not now to be reopened.

As to that portion of the bill in which the complainant seeks to inquire again into the computations of interest in the accounts between the two companies, a similar plea is filed; but this plea is waived, on the condition that all errors in the computation of interest shall be corrected on both sides.

They insist, by way of plea, that the complainant, by having acquiesced for so long a period in the correctness of the statements of the balances due from his company, is now precluded from questioning the correctness of the same.

They deny the correctness of the construction placed by the complainant on the agreement of the 19th of February, 1842, and allege that his construction is the result of an afterthought.

They pray that all that portion of the answer of Bolton which relates to the original contract for the purchase of the 77¼ sections of land, and to the circumstances preceding and attendant on the execution of the argument of the 19th of February, 1842, and to the intention of the parties to that agreement, may be made a cross-bill; and that Coopwood, and all the other surviving members of the Pontotoc and Holly Springs Land Company, and the heirs and legal representatives, naming them, of such as have died, may be made defendants thereto, and required to answer the same; and that upon the hearing, if the court shall be of the opinion that the agreement of the 19th of February, 1842, as it now stands, will bear the construction contended for by the complainant, that the court may direct the agreement to be so reformed as to set forth and express the real intention of the parties thereto, or for general relief.

Coopwood's answer to the cross-bill sets forth a list of the

lands purchased by his company from the New York and Mississippi Land Company, and admits generally the correctness of the statements in Bolton's answer, relative to the original purchase, except that he denies that the purchase was an entire contract, and alleges that it was several in respect of each particular section included in the purchase; and he also denies that he ever knew, until he saw Bolton's answer, what the numbers from 74 to 221 meant, which were placed on the various notes of the members of the Pontotoc and Holly Springs Land Company, given for the $77\frac{1}{4}$ sections of land.

He denies that the most valuable lands were those which were first sold by his company, or that those which remained unsold after July, 1839, were refuse lands, and alleges that the richest and most productive lands in the Chickasaw cession were not generally sold until after 1842.

He admits that all the cash payments received by members of his company upon sales of land were not applied towards the payment of their debt, but he believes he made the deficiency good, after he was appointed agent, by placing in the hands of Bolton "certificates of deposit of the banks of the country," and the notes of purchasers, as collaterals to the debt. That the whole debt of his company was due in 1839, but a part of it was previously paid. That in November, 1839, eight of the ten members of the Pontotoc and Holly Springs Land Company were insolvent, and the whole debt of the company was thrown upon respondent and Duke, and respondent was then embarrassed in his circumstances, aside from his indebtedness as a member of the Pontotoc and Holly Springs Land Company.

He admits that Duke and himself endeavored to sell the lands at auction, as stated by Bolton, in February, 1840, but denies that it was their intention to force a sale, at any sacrifice. Admits that the sale took place, but states that the only lands then really sold were those purchased by McCoarkle and William Coopwood.

He admits that the attempt to sell the lands at auction resulted in failure, but stated that the failure was the consequence, not of the inferiority of the lands, but of the scarcity of

money, the pressure of the times, and a general disinclination to incur new liabilities.

He admits that Duke and himself made the proposition of the 14th of March, 1840, to return the unsold lands at $1,440 per section, but states that he did so because Bolton admonished him that his principals were resolved upon having their "pound of flesh," and threatened him with a suit in the federal court, which would inevitably have ruined him. That at that time, and under those circumstances, he was willing to submit to a great loss, but that, as the proposition was not acceded to by Bolton, great apparent loss was saved to the respondent and his associates.

He denies that the proposition of the 14th of March, 1840, remained open until February, 1842, and alleges that, in all their negotiations, every proposition which was not accepted or rejected, with notice thereof to the other party, during the interview, was understood to be rejected; and he was never notified by Bolton that this proposition was held open for future action.

He denies that the agreement of the 19th of February, 1842, was made upon the basis of the proposition of the 14th of March, 1840, and alleges that the latter had nothing to do with the former. He states that the negotiations which led to that agreement occupied some eight or ten days, during which time many propositions were made on either side and rejected, until, at last, Hubbard proposed to modify the original contract so as to take back from the Pontotoc and Holly Springs Land Company, 35 sections of land then remaining on hand unsold, provided respondent and Duke would secure the payment of $16,230.64, in four equal annual payments; and this proposition was acceded to, and the *agreement* was drawn up while the terms of the contract were fresh in the recollection of all the parties. Respondent never understood that he was treating upon the basis of the proposition of the 14th of March, 1840, and he denies that it was the intention of all the parties to the agreement to provide thereby for carrying into effect that proposition, with or without the modifications thereof, stated by Bolton in his answer. And insists that the agreement of the

Coopwood *v*. Bolton et al.

19th of February, 1842, as it now stands, contains the real contract between the parties, and that he understood its legal effect to be, a cancellation of the original contract as to 35 sections, which left the parties in the same situation as if only 42¼ sections had been originally purchased, with a cash payment of $57,680, and he intended to make the New York and Mississippi Land Company account, upon a final settlement, for the sum of $26,133.33, which they had received upon the 35 sections; and he charges that Hubbard and Bolton also understood the agreement as a cancellation of the original contract as to 35 sections, which he infers from the fact that Hubbard, who drew up the agreement, is a lawyer of skill, and had a perfect knowledge of the legal import of the terms employed in the agreement.

He also insists, that the sum of $16,230.64, which he and Duke were required to secure under the agreement of the 19th of February, 1842, was a bonus for the cancellation of the original contract as to 35 sections; or, if it were not so, that he knew nothing of the data upon which Hubbard and Bolton made their calculations, each party being the keepers of their own counsel, and dealing with each other at arm's length.

He insists that his is the proper construction of the agreement of the 19th of February, 1842; denies that the draughtsman committed any mistake in drawing up the same; and insists that, as it now stands, it fully expresses the contract between the parties.

He submits two detailed statements, in the first of which he shows how he makes up the sum of $67,132.73, which he claimed from the New York and Mississippi Land Company in his original bill; and the other showing how, leaving out the credit of $26,133.33, he brings the New York and Mississippi Land Company in debt to the Pontotoc and Holly Springs Land Company in the sum of $31,697.46.

He closes by demurring to the cross-bill, without assigning any cause of demurrer thereto.

James Davis, representing one share, or one eighth, of the stock of the Pontotoc and Holly Springs Land Company; Jesse B. Clements and Benjamin Clements, representing one share, and Mary A. Lane, the widow, and Lafayette Lane, the

only child, and heir at law, of John W. Lane, deceased, representing one share, answering the cross-bill, adopting the answer thereto of Thomas Coopwood throughout; and the cross-bill was taken for confessed against William H. Duke, Alexander C. McEwen, David Henderson, the widow and minor children of William McEwen, deceased, and the unknown heirs at law of William Y. Goodall, deceased, representing together four shares.

Coopwood took no testimony whatever, depending wholly for his success upon the papers. The defendants took testimony, and the chancellor dismissed the bill, and Coopwood appealed to this court.

*Goodwin* and *Sale* for appellant,

Cited and commented on the following authorities : *Collins* v. *Flowers*, 1 How. 26 ; 14 S. & M. 1 ; *Scott* v. *Watkins*, 2 . S. & M. 255 ; Story on Part. § 164 ; Colly. on Part. ch. 5, § 1 ; 3 Chit. on Com. & Manu. 226 ; *Wasbourn* v. *Ingleby*, 1 Mylne & K. 51 ; Ib. 76 ; *Peck* v. *Thomas*, 13 S. & M. 18 ; 7 Ib. 224 ; 2 Story's Eq. Juris. § 1531 ; 1 Hen. & Munf. 121 ; 3 Ib. 416, &c.; 12 S. & M. 88 ; 2 Stark. Ev. 548, &c. ; 3 Hen. & Munf. 306, &c. ; 1 Johns. Ch. R. 429 ; Sug. on Vend. 255 ; Story's Eq. 156 ; 4 Brown's Ch. R. 388 ; 5 S. & M. 106 ; 3 Hen. & Munf. 416 ; 2 Johns. Ch. R. 596 ; 1 Brown's Ch. R. 342 ; 1 Story's Eq. § 151 ; 2 Johns. Ch. R. 632 ; 2 Hen. & Munf. 718, &c. ; 1 Story's Eq. § 127, &c.; 1 Brown's Ch. R. 94 ; 2 Johns. Ch. R. 596 ; 2 Story's Eq. § 137 ; 2 Johns. Ch. R. 59 ; 1 Peters, 1, &c.; 12 Ib. 32, &c.; Story's Eq. § 138 ; 2 Brown's Ch. R. 219 ; 1 Johns. Ch. R. 339 ; 1 Sug. on Vend. 229, &c. ; 9 Con. 96 ; 12 Peters, 32, &c.; Dan'l, Ch. Prac. 992 ; 2 Johns. Ch. R. 339, &c.; Story's Eq. Plead. § 257 ; Story's Eq. Juris. § 160, No. 1 ; 4 Brown's Ch. 414 ; 2 Caines, 155 ; Chit. on Cont. 624 ; 12 Johns. Ch. R. 275, &c.; 5 Ib. 85 ; 2 Stark. 70 ; 1 Term R. 133 ; 7 Bing. R. 266 ; 9 Barn. & Cr. 386 ; Story's Eq. Plead. § 798 ; 1 Johns. Ch. R. 557 ; 5 Ves. R. 27, &c.; 1 Story's Eq. § 523, & n. 3.

*Stearns* and *Harris* for appellees,

In reply, cited 8 S. & M. 205 ; 10 Ib. 446 ; Story on Part.

Coopwood v. Bolton et al.

§ 164; Gresley's Eq. Ev. 255; Coll. on Part. § 795; 2 S. & M. 255; Coll. on Part. § 8; Ib. § 1112; *Shelburne* v. *Inchiquin*, 1 Brown's C. R. 350; *Langley* v. *Brown*, 2 Atky. 203; *Irnham* v. *Child*, 1 Bro. C. R. 84; *Hunt* v. *Rousemaniere*, 1 Peters, 1; 1 Sug. on Vend. t. p. 166; Greenl. Ev. § 296; 1 Story's Eq. § 115; Ib. § 152, &c.; *Gillespie* v. *Moon*, 2 Johns. Ch. R. 585, and cases cited; 2 Ves. Jr. 334; 2 Dan'l, Ch. Pr. 765; *Chappedelaine* v. *Dechenaux*, 4 Cranch, 306.

Mr. Justice FISHER delivered the opinion of the court.

The complainant, Thomas Coopwood, filed his bill in the vice-chancery court at Holly Springs, praying that the defendants might be required to account for certain sums of money, to which the complainant alleges that he is justly entitled, by virtue of certain agreements entered into between the parties.

The important question for consideration, grows out of the construction which must be given to the agreement entered into between the complainant and William H. Duke, as agents, of the Pontotoc and Holly Springs Land Company, on the one part, and the defendants Bolton and Hubbard, as agents of the New York and Mississippi Land Company on the other part, and dated the 19th day of February, 1842. To understand properly this agreement, we must first ascertain the terms of the agreement to which it refers, entered into on the 19th of November, 1836, which is as follows, to wit. On the day last named the Pontotoc and Holly Springs Land Company, of which the complainant and William H. Duke were members, purchased of the New York and Mississippi Land Company, 77¼ sections of land at the price of $2,240 per section, making the aggregate sum of $173,040, one third of which was at the time paid in cash; and to secure the other two thirds the notes of the purchasers were given, bearing interest at six per cent. per annum, payable two and three years after date.

In closing the contract, two notes for the amount to be paid on account of each section were given, and bonds for title in like manner executed; the object of which arrangement was obviously for the convenience and advantage of the purchasers, to enable them, at any time they might desire, to perfect the

title to any particular section of land, on payment of the amount of the purchase-money due thereon.

We, come now to consider the agreement of the 19th of February, 1842, by which it is insisted, on behalf of the complainant, that the New York and Mississippi Land Company wholly rescinded so much of the original contract as related to 35 sections of the land, and that, consequently, the complainant and his associates are entitled to recover back the cash payment, exceeding $26,000, made on account of said 35 sections of land. The agreement was entered into by Bolton and Hubbard, as agents of the New York Land Company. After certain recitals, it proceeds as follows:— They (Bolton and Hubbard) agree " to modify said contract, (meaning the contract of 19th of November, 1836,) so far as to take back the lands which said Duke and Coopwood represent as unsold, upon said Duke and Coopwood, securing the payment of sixteen thousand, two hundred and thirty dollars and sixty-four cents, by a deed of trust conveying certain lands to William D. Bradford and George G. Reneau, as trustees, conditioned to pay the same in four equal payments, due 1st April, 1843, 1844, 1845, and 1846, and for which the said Duke and Coopwood have executed their joint notes each for four thousand and fifty-seven 66-100 dollars." It next provides that the notes given for said 35 sections of land shall be surrendered to Duke and Coopwood, and that they shall deliver to Bolton and Hubbard the bonds for titles to said sections. It finally provides that the notes for the lands not taken back, shall remain as they were under the original contract.

We perceive no difficulty whatever in the construction of this contract. If, as contended by the complainant, the sum of $26,000, the original cash payment on account of these sections of land, was to be restored, it is singular and almost unexplainable, that he and Duke should not only be required to execute their four notes, amounting in the aggregate to $16,230.64, but should actually secure them by a deed of trust upon land, as the very condition upon which the 35 sections of land were taken back. To our minds, the contract is susceptible of a much more natural and reasonable interpretation, and

that is simply this: that Bolton and Hubbard agreed to receive in full satisfaction of the notes by them held on account of the 35 sections of land, the land itself, together with the sum of $16,230.64; or, to state the proposition more clearly, Duke and Coopwood agreed to pay $16,230.64, and to surrender the 35 sections of land, to be released from any further payment on account of the same. This is our construction of the agreement, as it appears upon its face. That it is certainly the true construction, not a doubt can be entertained, as it corresponds exactly with the action of the parties under it at the time. Even if we entertained doubts as to the true construction, it would only be in an extreme case that we would not take the action of both parties, assented to by themselves, as the very best exposition of their own contract. No safer rule could be followed by either a court of law or equity in a doubtful case. There is not one word said in the agreement about refunding the money paid, or that every dollar stipulated to be paid by the notes for the purchase-money of the 42 sections, is not to be paid. On the contrary, the stipulation is, that the land will be taken back on the complainant and Duke assuming and securing to be paid the sum named. Under the complainant's construction of the contract, so far from his paying any thing, he and Duke were to receive, as clear profits to themselves, about the sum of $10,000, by the rescission; or, in other words, Bolton and Hubbard were to give about this sum to induce the complainant and Duke to enter into the contract. There is nothing, in either the language or object of the contract, giving the least countenance to this construction.

Having disposed of the point about which there exists the greatest difference between counsel, the other questions may be disposed of in few words.

It is insisted that the defendants are still indebted to the complainant, on account of moneys collected on collateral paper, taken to secure the notes for the 42 sections of land. Accounts of the moneys thus collected and applied to the payment of said notes, appear to have been rendered to the complainant on the 30th of November, 1842, on the 8th of August, 1844, on the 1st of June, 1846, and on the 8th of June, 1847.

It is not shown or pretended that the complainant urged any objections to these several accounts till he filed his bill. On the contrary, there are strong circumstances showing that he assented to the most of them at the time.

Having been thus received and retained without objection, they have become stated accounts; and it is incumbent upon the complainant who alleges the error, not only to specify it, but to sustain it, if controverted by clear and satisfactory evidence. The defendants make out their case when they show that the accounts have become stated accounts, or acquiesced in by the complainant. This point was considered and settled by this court in the case of *Stebbins* v. *Niles*, 3 Cushm. 267.

There is nothing showing that Bolton has received more money than he has legally accounted for. It is true, the notes for the 42 sections of land have been overpaid, but the balance of the money has been applied to the notes of complainant and Duke, and this was certainly a legal application of the money.

Finding no error in the decree, it is affirmed.